**Tony HARRISON, Petitioner,**

v.

**Daniel SENKOWSKI, Respondent.**

No. 00–CV–6830.

United States District Court,
E.D. New York.

Jan. 22, 2008.

Martin Goldberg Law Offices by Martin Goldberg, for Petitioner Tony Harrison.

Kings County District Attorney's Office by Marie–Claude Palmieri Wrenn, for Respondent Daniel Senkowski.

### MEMORANDUM, ORDER & JUDGMENT

JACK B. WEINSTEIN, Senior District Judge:

## Table of Contents

I. Introduction ................................................ 404

II. Facts and Procedural History ............................... 404
   A. Crimes and Trial at Issue in This Proceeding ............ 404
   B. State Direct Appeal and First Round of State Collateral Attacks ............ 408
   C. First Round of Federal Habeas Proceedings ............... 409
   D. Second Round of State Collateral Attacks ................ 410
   E. *Motion to File a Successive Petition for the Writ of Habeas Corpus* .......... 411
   F. *Motion to Vacate Pursuant to Rule 60(b) of the Federal Rules of Civil Procedure in This Court* ............ 411
   G. January 9, 2008 Non–Evidentiary Hearing ................ 412
   H. Similar and Unrelated Crimes in Other Jurisdictions ...................... 413

III. Harrison's Rule 60(b) Motion Challenging the Denial of the Original Habeas Petition ...................................... 413
   A. Rule 60(b) of the Federal Rules of Civil Procedure ......................... 413
   B. Evidentiary Hearings and Appointment of Counsel in Section 2254 Cases ..... 414
   C. Lack of Merit to Rule 60(b) Motion .................................... 417

IV. Harrison's Rule 60(b) Motion Alleging Factual Innocence ....................... 417
   A. Successive Habeas Petition ............................................ 417
   B. Lack of Merit ........................................................ 418
   C. Transfer to Court of Appeals Rather than Dismissal ...................... 418

V. Certificate of Appealability as to the Rule 60(b) Motion Challenging the Denial of the Original Habeas Petition ......................................... 419

VI. Conclusion ................................................ 419

## I. Introduction

The current motion is another phase of a lengthy series of collateral attacks by Petitioner Tony Harrison. He has prosecuted federal habeas and post-federal habeas proceedings in the Eastern and Southern Districts of New York.

Harrison now moves pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure to vacate this court's denial of his petition for a writ of habeas corpus. He argues that the denial of his petition should be reversed by this court because (1) it did not appoint counsel in his habeas proceeding; and (2) he is factually innocent of the crime.

Counsel for the instant Rule 60(b) motion was appointed. A non-evidentiary hearing on the law was held on January 9, 2008.

For the reasons stated below: (1) the instant Rule 60(b) motion is denied on the merits to the extent that it pertains to a claim challenging the denial of the original habeas petition; (2) the portion of the Rule 60(b) motion raising a claim of factual innocence is denied because it is in effect a successive habeas petition; a transfer of this claim to the Court of Appeals for the Second Circuit as a petition to file a successive petition in the district court is granted; and (3) a certificate of appealability to appeal the denial of that portion of the Rule 60(b) motion now decided on the merits is denied.

## II. Facts and Procedural History

### A. Crimes and Trial at Issue in This Proceeding

At about 3:00 a.m. on March 4, 1995, Harrison followed a woman into her apartment-house in the Park Slope area of Brooklyn ("Victim 1"). *See* Trial Transcript ("Trial Tr.") at 122 *ff.* Once inside the building, he covered the victim's face with a hat, threatened her with a knife to her throat, and raped her. *Id.* He then forced his prey up five flights of stairs into her apartment and raped her again. *Id.* During the rape, Harrison used a condom and a white shirt which he had wrapped around the victim's head; both items containing his DNA were recovered by the police from the bedroom. *Id.*

At about 3:00 a.m. on June 23, 1995, Harrison attacked a second female victim in the same area ("Victim 2"). *Id.* at 41 *ff.* He placed a mask on the victim's head, threatened her with a knife at her throat raping her in the vestibule of her building. *Id.* Harrison again used a condom, but this time, took it with him. *Id.*

Following the rape of these two women, the New York Police Department ("NYPD") began to stakeout the area. *Id.* at 62–63. In each case, the victims were attacked while walking alone early in the morning by an assailant described as a black male in his mid-twenties, six-feet tall, approximately 220 pounds, with short hair. *Id.* 52, 136.

At about 5:00 a.m. on September 16, 1995, Harrison was observed following another young woman by a police surveillance team in an unmarked car ("Victim 3"). *Id.* at 316, 318, 321. He ran up to the woman as she attempted to enter a friend's building; she managed to break away and run into the middle of the street as the police pulled up. *Id.* at 319–21. Visibly shaken, she was interviewed by the police on the street. *Id.* at 269–70. Harrison was immediately arrested after the police observed that he met the general description of the assailant given by the previous two rape victims. *Id.* at 270.

After the arrest, Harrison appeared in a police line-up where he was identified by Victim 2 as her rapist. *Id.* at 56–57. Because Harrison had covered the face of Victim 1 with a hat, she failed to identify him. *Id.* at 135, 276–280.

Based upon his acts of June 23, 1995 involving Victim 2, Harrison was indicted on October 6, 1995 in Kings County for: rape in the first degree (New York Penal Law ("N.Y.P.L.") § 130.35[1]); sodomy in the first degree (N.Y.P.L. § 130.50[1]); three counts of sexual abuse in the first degree (N.Y.P.L. § 130.65[1]); menacing in the second degree (N.Y.P.L. § 120.14); and unlawful imprisonment in the second degree (N.Y.P.L. § 135.05). *See* Harrison's Rule 60(b) Mot. at 5.

This indictment also charged Harrison with the aborted incident involving Victim 3 on September 16, 1995: harassment in the first degree (N.Y.P.L. § 240.24); and resisting arrest (N.Y.P.L. § 205.30). *See id.;* Respondent's Affidavit in Opposition to Harrison's Rule 60(b) Motion ("Resp.Aff") at 6,

Docket Sheet for No. 00–CV–6830, Entry No. ("Docket Entry No.") 42.

On December 22, 1995, the state trial court found that probable cause existed to require Harrison to provide a blood sample for comparison with that of Victim 1. *See In re Harrison*, 224 A.D.2d 420, 638 N.Y.S.2d 314 (N.Y.App. Div.2d Dep't 1996). Harrison sought a stay of the order. It was denied by the Appellate Division. *See id.* (denying Harrison's petition for prohibition because he "failed to demonstrate a clear legal right to the relief sought."). On January 10, 1996, the police obtained blood samples from Victim 1. *See* Trial Tr. at 135–36; 280–81. Harrison had resisted his own blood removal on February 15, 1996; he had to be held down by seven correction officers. *See id.* at 281–82. Detective Sanchez, who was present, vouchered and transported Harrison's blood sample to the laboratory. *Id.*

After the blood samples of Victim 1 and Harrison were tested, on June 10, 1996, he was indicted for: rape in the first degree (N.Y.P.L. § 130.35[1]); two counts of sodomy in the first degree (N.Y.P.L. § 130.50[1]); three counts of sexual abuse in the first degree (N.Y.P.L. § 130.65[1]); burglary in the first degree (N.Y.P.L. § 140.30); and menacing in the second degree (N.Y.P.L. § 120.14). *See* Harrison's Rule 60(b) Mot. at 5. Both indictments were consolidated in Kings County on July 23, 1996. *Id.*

Harrison's state court trial proceedings generally proceeded along conventional lines despite his erratic behavior. He walked out of the courtroom, refused to participate, threatened to kill himself, took 35 pills of a prescribed psychotic drug during proceedings and partially removed his clothes before the judge. The presiding trial judge showed great patience. Despite Harrison's disruptive actions he received a fair trial.

It appears that Harrison's first counsel had been removed at Harrison's request, with Gregory Clarke appointed as "legal adviser." *See* Transcript of Suppression Hearing ("Supp.Hr.Tr.") at 4. In effect, Clarke participated in the pretrial suppression hearings, the trial, and the sentencing hearing as Harrison's counsel, not merely as his legal adviser.

At a pre-trial suppression hearing on December 16, 1996, Harrison objected to having Clarke represent him. *See id.* Harrison told the court:

> [Harrison]: Before I let this man represent me and you take me to trial, I will kill myself.
>
> Put that on the record.
>
> If they force me to trial, I will kill myself because I do not want this man as my legal adviser or my lawyer.
>
> The Court: Mr. Harrison—
>
> [Harrison]: Because there is no justice in this Court.
>
> I will cut myself.
>
> The Court: Call your first witness. If you can't control yourself and follow—
>
> [Harrison]: I am not a violent person. I am out of here.
>
> Put the handcuffs on me, please.
>
> The Court: Are you leaving the courtroom, Mr. Harrison?
>
> [Harrison]: Want to get out of here.
>
> The Court: Are you leaving the courtroom?
>
> [Harrison]: I don't want this man as my legal adviser and I don't want this man as my lawyer.
>
> I address the Court and whatever happens from [sic] me, I will tell you, I will kill myself before I let these people prosecute.
>
> . . . .
>
> I address[ed] the issue[ ] a couple of times and you are forcing me into hearings with this man.

*Id.* at 4–5. Harrison insisted on leaving the courtroom, remarking that he could barely see his family in the courtroom because he did not have his glasses. *Id.* at 5–6.

The hearing was conducted in Harrison's absence after he declined to return to the courtroom. *Id.* at 10, 27. He was informed by a court officer that his trial would take place on January 6, 1997, and that if he wanted to attend, he should "be sure to bring his glasses and papers he's been furnished with and be prepared to go forward." *Id.* at 55–57.

On January 6, 2007, during the *voir dire*, the court read a letter it had sent to Harrison regarding his absence at the suppression hearing and his request for another lawyer. *See* Transcript of Voir Dire ("Voir Dire Tr.") at 2–5. After the trial judge read the letter, the following colloquy took place:

> [Harrison]: Your Honor, I don't want this man as my lawyer. As always and truly, I am telling you this man is not competent. This man, he was just in the room, told me I will be doing a lot of time in Attica and the man is ... incompetent. We don't get along. There is no communication at all.
>
> Your Honor, I truly would like a fair trial and a fair hearing.
>
> The Court: I understand that, Mr. Harrison.
>
> [Harrison]: I'm asking for fair and you know, fair due process....

*Id.* at 5–6.

Harrison claimed that he had not seen a private investigator (which had been obtained by his lawyer) and that his attorney had not interviewed his alibi witnesses. *Id.* at 6. His counsel informed the court that a private investigator had spoken with Harrison on several occasions and that Harrison was uncooperative. *Id.* at 7–8. Harrison responded that his lawyer was lying. *Id.*

> The Court: This is your second lawyer. You didn't get along with your first lawyer. I know him to be a competent conscientious lawyer.
>
> [Harrison]: This man is not competent, your Honor....
>
> The Court: I've ruled that he is competent and we are going to start the trial now.
> ....
> If you don't want to participate, that's a decision you are making, but I am not replacing Mr. Clarke. I've told you that five or six times and I said that in the letter.
> ....
> If you are correct, Mr. Harrison, and if you are convicted by a jury, you may bring that up as the grounds of appeal and if the Appellate Court disagrees with me, you'll get another trial with another lawyer, but I have made my decision that you are not getting another

lawyer. We have waited too long for this trial. We are going to have it now. Mr. Clarke is doing the best job he can.
> ....
> [Harrison]: How are you going to have this man destroy my life like this, your Honor?
>
> The Court: Mr. Harrison, that is your choice.
>
> Do you want to remain in the courtroom while the jury is being selected or do you want not to remain in the courtroom while the jury is being selected?
> ....
> [Harrison]: I'm in the courtroom now.

*Id.* at 7–12.

At this hearing, Harrison again threatened to take his own life; while in the courtroom his attorney observed Harrison put some pills in his mouth. *Id.* at 14. Harrison then stated that he had taken 35 pills of Dilantin, which were his prescribed medication for seizures. *Id.* at 16. The court continued to discuss matters with counsel, and ignored Harrison's beginning to remove his clothes. *Id.* at 17. The judge again asked Harrison whether he wished to remain in the courtroom when the jury arrived. *Id.* at 29, 34. Harrison elected to remain. *Id.*

When Harrison momentarily left the courtroom to wait for the jury to enter, the trial judge made a record as to his physical appearance and her reasons for ignoring his behavior:

> The Court: The Court chose not to recess the case despite [ ] [Harrison's] claim that he killed himself or he was going to kill himself because he made the same threat right before the Christmas recess when we held the hearing. He told me he was gong to kill himself and we had a suicide watch on him. He has on prior occasions demonstrated an ability to simulate physical problems when, in fact, they do not exist.
>
> The Court determined based on her observations of him while he was in the courtroom and on his prior history that he had not attempted to take his life, and therefore, did not stop the proceedings.

*Id.* at 36. The case was adjourned until January 7, 1997. *Id.* at 50, 57.

On January 7, the case was again adjourned because Harrison had had apparent seizures. He was taken to a hospital. *Id.* at 63–65. On January 8, Harrison did not appear because he had an appointment with an eye doctor. *Id.* at 67. That appointment was cancelled and Harrison was produced late in the afternoon. *Id.* at 67. He then lay down in the corridor and said he was having an epileptic seizure. *Id.* Although paramedics stated that his seizure did not appear to be genuine, they took him to the hospital. *Id.* Harrison's doctor was consulted by the court. The physician stated that Harrison had received his medication that morning with an extra dose to prevent seizures. *Id.* The case was again adjourned until the next day. *Id.* at 69.

Harrison was again produced on January 9, 1997. *See id.* at 71. He requested another adjournment because he would not come to court on the following day, Friday, this time claiming that he was a practicing Muslim. *Id.*

The court informed him that it had been told by a corrections department physician that Harrison had been refusing his seizure medication on occasion. *Id.* at 71–72. The court arranged to have his blood checked daily to assure a therapeutic level of the drug. *Id.* at 72. It informed him that if the court determined that he was having seizures as a result of his refusal to take medication, the trial would go forward in his absence. *Id.* at 73–74. As Harrison was leaving the courtroom, he brought to the court's attention his need for eyeglasses:

> [Harrison]: [Y]ou told me, per se, a couple of weeks ago to work on getting my own glasses, you have no control over that. I've worn glasses since I'm a kid. I had went to go take care of my glasses situation yesterday and—are you listening to me? It's a very important issue, because I need my glasses.
>
> The Court: Yesterday you were not produced because you had an appointment to get eye glasses.
>
> When you're on trial you don't get eyeglasses. You've had three weeks to get eyeglasses.

> . . . .
>
> Mr. Harrison, I've had a series of excuses from you since we scheduled this case for trial; each one of a slightly different nature as to why you couldn't go forward.

*Id.* at 81–82.

The trial judge declared that she would call the corrections department to see if an appointment for eyeglasses could be made, but the trial would not be further delayed. *Id.* at 82. The judge also noted that Harrison had intermittently worn glasses for the year he had been appearing in her courtroom, and that she had no idea where his glasses were, but would assist counsel in making an appointment the following day. *Id.* The judge phoned a corrections department representative and was advised that corrections would make every effort to obtain eyeglasses for the petitioner. *Id.* at 85.

On January 13, 1997, when the voir dire continued Harrison requested another adjournment of nearly one month for the Islamic month of Ramadan. *See id.* at 88. The judge declined to adjourn the trial. It told Harrison that jury selection would proceed and that he would have his eyeglass appointment on January 14. *Id.* at 89–90. During the jury selection on January 13, Harrison's counsel objected to proceeding without Harrison's eyeglasses, noting that he was having difficulty seeing the jurors. *Id.* at 161–63. The judge stated once again that the eyeglass issue did not come up until jury selection, and that she had seen Harrison without glasses before his claim that they were broken. *Id.* The judge reiterated:

> The Court: [T]his seems to be yet another reason—we had this morning he needed the month off for religious reasons, last week we had a suicide attempt and then epileptic seizures based on the fact he did not take his medicine regularly.
>
> These women who are the witnesses have been prepared, they are brought, they are ready to go.

*Id.* at 165–66.

Jury selection was completed on January 13, 1995. On January 15, the court reconvened. It noted that the day before had

been spent in procuring glasses for Harrison, who now had them. Trial Tr. at 2.

At trial, Mary Quigg, a New York Police Department forensic serology expert, testified that she found sperm on the white shirt and condom recovered from Victim 1's apartment. *Id.* at 210, 212–14. The shirt, condom, and blood samples retrieved from Victim 1 and Harrison were all preserved for DNA analysis. *Id.* at 228. As to the chain of custody, Donna Goldstein, a paralegal with the prosecution's office, testified that she went to the police laboratory on February 22, 1996 and March 27, 1996, and received property from Quigg, which she then mailed to the Laboratory Corporation of America for DNA testing. *Id.* at 258–60, 388.

Meghan Clement, a DNA expert, tested the blood samples from Victim 1 and Harrison against the stain removed from the shirt taken from Victim 1's apartment. *Id.* at 397. She testified that DNA in the sperm and non-sperm removed from the shirt was consistent with DNA in Harrison's blood. *Id.* at 408. Testing also revealed that Harrison could not be excluded as the source of the DNA in both the condom recovered in Victim 1's apartment, and in the stain on the shirt. *Id.* at 428. Further testing and statistical calculations revealed that:

> For the match on the sperm fraction of the condom, the probability of randomly selecting an unrelated individual with a DNA profile consistent with the nine areas of DNA that we tested would be one in approximately 252 million for the Caucasian population, one in 2,710,000 for the African–American population, one in 24,600,000 for the Southeastern Hispanic population and one in 56,500,000 for the Southwestern Hispanic population.

*Id.* at 429–30. Defense counsel's searching cross-examination of the prosecution's forensic witness covered over fifty pages of the trial transcript. *Id.* at 432–84, 493–95.

Harrison's counsel diligently challenged the state's forensic evidence. The defense called Dr. Louis Levine, an expert in population genetics, who testified that the DNA test used by the prosecution was inadequate and incomplete. *Id.* 552–77. He opined that technology existed for testing beyond the capabilities of the laboratory that performed the DNA testing in Harrison's case. *Id.* at

570. He asserted that had this technology been applied, it might have been possible to exclude Harrison's DNA as a match. *Id.* at 575, 580.

Harrison's mother, who lived with him, testified that he worked nights as a security guard and a male stripper, and usually came home early in the morning. *Id.* at 524, 528, 532–44. She swore that Harrison had worn glasses since infancy and one of his eyes turned slightly inward. *Id.* at 548. Specifically, she declared that on the night of March 3–4, 1995, Harrison had left to go to work, *id.* at 528; on June 22–23, 1995, had come home sometime between 7:00 and 9:00 p.m. and stayed there the entire night. *Id.* at 533–46.

On February 7, 1997, a Kings County jury convicted Harrison of the following crimes: two counts of rape in the first degree (N.Y.P.L. § 130.35[1]); two counts of sodomy in the first degree (N.Y.P.L § 130.50[1]); and harassment in the first degree (N.Y.P.L. § 240.25). *See People v. Harrison,* 255 A.D.2d 335, 681 N.Y.S.2d 38, 38 (N.Y.App. Div.2d Dep't 1998). He was sentenced to four consecutive terms of twenty-five years to life imprisonment as a persistent felony offender. *Id.*

## B.  State Direct Appeal and First Round of State Collateral Attacks

On his direct appeal, Harrison made the following arguments: (1) the trial court's refusal to adjourn jury selection to enable him to obtain eyeglasses was unconstitutional and a violation of New York state law; (2) because the police lacked probable cause to arrest him on September 16, 1995, the trial court should have suppressed Victim 2's identification of Harrison at the police line up; (3) there was no probable cause to draw Harrison's blood for comparison with that of Victim 1; and (4) the sentence was excessive. *See* Harrison's Brief on Direct Appeal dated May 1998 at 35, 45, 50, 58, filed in the District Court's Clerk Office on Feb. 16, 2001.

On November 2, 1998, the Appellate Division unanimously affirmed the judgment and sentence. *See People v. Harrison,* 255 A.D.2d 335, 681 N.Y.S.2d 38, 38 (N.Y.App. Div.2d Dep't 1998). As to Harrison's eye-

glasses, the court held that "[t]here is an ample basis in the record ... to conclude that, after having adjourned the case for trial on several occasions on [Harrison's] account, the trial court did not improvidently exercise its discretion in refusing to grant the adjournment ... requested on the eve of trial." *Id.* at 39. In denying Harrison's claim regarding the line-up, the court noted that "the police officers had probable cause to believe that [Harrison] had harassed one of the victims as she walked to her friend's house in the early morning hours." *Id.* (citations omitted). In regard to Harrison's claim that there was no probable cause to draw his blood for DNA testing, the court held that "[p]robable cause existed to believe that [Harrison] had raped another victim on an earlier date." *Id.* (citations omitted). The New York Court of Appeals denied Harrison leave to appeal on February 17, 1999. *See People v. Harrison*, 93 N.Y.2d 853, 688 N.Y.S.2d 501, 710 N.E.2d 1100, 1100 (1999).

On March 13, 1999, the trial court denied Harrison's motion to collaterally challenge his conviction on the grounds of ineffective assistance of counsel, prosecutorial misrepresentation, and introduction of false evidence. *See* N.Y.Crim. Proc. Law § 440.10; Decision and Order, dated March 14, 2000, filed in the District Court Clerk's Office as Ex. G on Feb. 16, 2001. Denying Harrison's ineffective assistance of counsel on the merits, the court noted:

> Defendant's claim of ineffective assistance of counsel appears to be fabricated out of whole cloth. Assigned counsel's level of representation far exceeded the minimum standards required by law. In the face of overwhelming evidence at trial and at the side of a difficult client, counsel exhibited ingenuity, a high level of competence and the appropriate degree of zealousness.

*Id.* On August 23, 2000, the Appellate Division denied Harrison leave to appeal the denial of his collateral challenge. *See* Decision and Order, dated Aug. 23, 2000, filed in the District Court Clerk's Office as Ex. H on Feb. 16, 2001.

### C. First Round of Federal Habeas Proceedings

In November 2000, Harrison filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the Eastern District of New York. *See* Harrison's Petition for the Writ of Habeas Corpus dated Oct. 30, 2000 ("Harrison's Original Habeas Petition"), Docket Entry No. 2. In this petition, Harrison made the following claims:

> ▪ Petitioner was deprived [of] his due process rights to effectively participate injury selection....
>
> ....
>
> ▪ Petitioner was denied his Constitutional rights, when the Court granted the people to [*sic*] involuntarily draw Petitioner's blood for D.N.A. comparison....
>
> ....
>
> ▪ Petitioner's Constitutional rights were violated by the manner [in] which the prosecution obtained blood samples....
>
> ....
>
> ▪ Petitioner was denied effective assistance of trial counsel....

*Id.*

The court ordered a hearing for April 27, 2001. *See* Order dated March 26, 2001, Docket Entry No. 15. Harrison then wrote to the court: "I want to participate, and I need to participate at this hearing. I also request that you assign me legal representation, so my rights will be secured accordingly." *See* Harrison's Letter dated April 10, 2001, filed on April 12, 2001, Docket Entry No. 17. By Order dated April 16, 2001, the court denied Harrison's motion for appointment of counsel "[a]bsent a showing of possible merit, with leave to renew." *See* Order dated April 16, 2001, Docket Entry No. 16.

A non-evidentiary hearing was held on April 27, 2001 at which Harrison presented his claims via telephone from the prison. Harrison alleged that his trial counsel was ineffective because he failed to adequately question witnesses that Harrison believed had committed perjury, challenge Harrison's identification in the police line-up, and investigate the forensic evidence admitted at trial. *See* Transcript of April 27, 2001 Hearing at 6–8, Docket Entry No. 25. He alleged that his rights were violated during the voir dire when the trial court failed to adjourn pro-

ceedings until Harrison was able to obtain eyeglasses. *Id.* at 8. Harrison also claimed that the prosecution lacked probable cause to draw his blood for DNA testing, and that his rights were further violated when the police forcibly drew a blood sample. *Id.* at 32.

At the hearing, Harrison was not placed under oath and not questioned by the court or respondent about any facts not already in the state court record. *See id.* At the outset of the hearing, the court stated, "[t]ell me what your problem is please and why you want this Court to grant a writ of habeas corpus." *Id.* After Harrison discussed his ineffective assistance of counsel claim, the court stated, "[w]hat are the other issues? Just state them, please, because I have the papers before me." *Id.* at 8. After Harrison explained his eyeglasses claim, the court stated, "I understand that point. What is your next point?" *Id.*

After hearing Harrison assert his other claims and asking respondent about Harrison's state court exhaustion, the court stated, "I am not going to appoint counsel for you, because I do not think there is ... sufficient merit in the case." *Id.* at 12. Thereafter, the following colloquy took place:

> Mr. Harrison: You don't think there is sufficient merit?
>
> The Court: No.
>
> However, you can apply to the Court of Appeals ... for permission to take the case to the Court of Appeals. I am not certifying the case for appeal in this Court, because I do not think there is sufficient merit. The matter was thoroughly considered by the state court. The DNA was overwhelming. Counsel seemed to be perfectly adequate and the evidence was overwhelming.
>
> Mr. Harrison: Overwhelming, your Honor, I mean if you look at the evidence they had people testifying and perjuring themselves on the stand. They didn't have people at the trial that did the [DNA] testing. People who actually did the testing, your Honor, did not testify at my trial.
>
> The Court: I understand.
>
> . . . .
>
> I have looked at the papers in the case and I find there is not a sufficient ques-

tion to warrant the federal court to intervene [on the ground] that you did not get a fair trial, sufficiently fair under the Constitution. You had an opportunity to appeal and there is no basis for this Court to intervene in this case. Reluctantly, I am sorry that I cannot help you and your mother more. I am going to dismiss the case. If you want to try to take an appeal—

> Mr. Harrison: I would like to appeal.
>
> The Court: I will ask our pro se clerk to try to help you. Good luck with your appeal. Thank you.

*Id.* 12–13.

By Order dated May 8, 2001, Harrison's petition was denied "for the reasons stated orally on the record." *See* Order dated May 8, 2001, Docket Entry No. 19. The court also denied a certificate of appealability. *Id.* The Clerk of the District Court entered a judgment of dismissal on May 16, 2001. *See* Judgment dated May 16, 2001, Docket Entry No. 20.

Between the time of the April 27 hearing and the May 8 Order, Harrison made another "application for appointment of counsel," dated May 2, 2001 and filed in the clerk's office on May 24, 2001. *See* Harrison's Motion for Appointment of Counsel dated May 2, 2001, Docket Entry No. 22. That request was denied by an Order filed in the clerk's office on May 23, 2001. *See* Docket Entry No. 23.

Harrison then appealed the denial of his petition to the Court of Appeals for the Second Circuit. By Mandate dated January 23, 2003, the Court of Appeals for the Second Circuit dismissed Harrison's appeal and found that he had not demonstrated "a 'substantial showing of the denial of a constitutional right.'" *See* Mandate of the Court of Appeals for the Second Circuit dated January 28, 2003, No. 01–2304, Docket Entry No. 27 (*quoting* 28 U.S.C. § 2253(c)).

### D. Second Round of State Collateral Attacks

Harrison returned to the state court. On May 16, 2003, he filed another motion to set aside his sentence. *See* N.Y.Crim. Proc. Law

§ 440.20; Harrison's Rule 60(b) Mot. at 7; Resp. Aff. at 11. That motion was denied on July 17, 2003. *See* Harrison's Rule 60(b) Mot. at 7.

He then filed a petition for a writ of *coram nobis* on January 4, 2004, alleging that his appellate counsel, who had filed a sixty-page brief in the Appellate Division on his behalf, was ineffective for failing to raise the ineffectiveness of his trial counsel and various other claims. *See* Resp. Aff. at 11. On Harrison's direct appeal his appellate counsel had filed an affirmation in the Appellate Division providing that there was no basis to raise a claim of ineffective assistance of trial counsel. *Id.* n. 5.

Harrison's coram nobis application was denied on April 9, 2004. Leave to appeal was denied by the Court of Appeals on July 14, 2004. *Id.* at 11.

By motion dated March 7, 2006, Harrison again sought in state court to vacate his judgment of conviction, claiming as he had in every previous motion, that the prosecutor's forensic evidence was flawed. *Id.* at 11–12. He claimed that the prosecutor misrepresented the identity of the person who analyzed the rape kit at his trial. *Id.* at 12. This claim was based on the answer Harrison received to a request for documents under the New York Freedom of Information Law ("FOIL"), N.Y. Pub. Office Law § 84–90. *See* Ex. "C" attached to Harrison's Rule 60(b) Mot. The FOIL officer found that a document search revealed no report by a chemist, Sonia Basiles, in the trial folder; instead it revealed reports by Meghan Clement, a DNA expert witness for the prosecution. *Id.* At trial, Mary Quigg, a supervising forensic serologist for the NYPD Laboratory, had testified that Basiles, who no longer worked for Quigg, had performed some of the tests which Quigg's own testimony was based upon. *See* Trial Tr. at 235–36. The Basiles report was admitted in evidence during the state trial as "People's Exhibit 8" without objection. *Id.*

The New York Supreme Court denied Harrison's motion for a new trial on May 17, 2006, stating that Harrison had imagined a far-fetched conspiracy, and that "the quality and reliability of the evidence presented regarding the laboratory report and the subse-

quent DNA analysis would have been unaffected by such speculation." *See* Resp. Aff. at 13. The Appellate Division denied leave to appeal. *Id.*

## E. Motion to File a Successive Petition for the Writ of Habeas Corpus

Harrison then filed a motion in the Court of Appeals for the Second Circuit seeking leave to file a successive habeas petition in the district court. *See* Mandate of the Court of Appeals for the Second Circuit dated January 19, 2007, No. 06–4775–op, Docket Entry No. 32. This motion was based upon documents that Harrison had recovered through the state court FOIL litigation. The Court of Appeals denied the motion because Harrison had "failed to satisfy the criteria set forth in 28 U.S.C. § 2244(b)(1) and (2)." *Id.*

## F. Motion to Vacate Pursuant to Rule 60(b) of the Federal Rules of Civil Procedure

On July 7, 2007, Harrison returned to this court. He filed a motion pursuant to Rule 60(b) of the Federal Rule of Civil Procedure. *See* Harrison's Rule 60(b) Motion dated June 29, 2007 ("Harrison's Rule 60(b) Mot"), Docket Entry No. 35. The motion is construed liberally in favor of the petitioner. *See Frank v. Mangum*, 237 U.S. 309, 331, 35 S.Ct. 582, 59 L.Ed. 969 (1915) (habeas courts should "look beyond forms and inquire into the very substance of the matter").

Harrison's Rule 60(b) motion is to vacate this court's May 8, 2001 Order denying his petition for the writ of habeas corpus on the following grounds: First, he claims that counsel should have been appointed pursuant to Rule 8(c) of the Rules Governing 2254 Cases ("Section 2254 Habeas Rules") for the hearing held on April 27, 2001. *See* Harrison's Rule 60(b) Mot. at 26. Second, he claims factual innocence based on the evidence recovered through the FOIL litigation. *Id.*

Counsel was appointed on July 12, 2007. *See* Order dated July 12, 2007, Docket Entry No. 36. After obtaining two adjournments, by letter dated November 20, 2007, Harrison's attorney requested another adjournment because Harrison had been transported

to a medical facility. *See* Letter from Martin Goldberg dated November 20, 2007, Docket Entry No. 47. Counsel also informed the court that he would not be filing a brief on Harrison's behalf:

The basis for this proceeding is that [by] using the freedom of information law Mr. Harrison received a document stating that a chemist with the last name of Basiles had not worked on his case. This appeared to be highly significant because at the trial a supervisor had testified that the chemist who had worked on Mr. Harrison's DNA was named Basiles. This created a chain of custody problem and appeared to cast doubt as to the reliability of the DNA match as to Mr. Harrison. However, a police laboratory analysis report (Trial Exhibit 8) which was recently provided to defense counsel is signed by a chemist named Samia Basilious. Obviously there is not much difference between "Basiles" and "Basilious" so that any arguments based on this would be frivolous. In addition during the trial the trial attorney for Mr. Harrison employed the services of Dr. Kobalinski to review the DNA results and the trial transcripts confirm that he was present in Court during the testimony of the prosecution witnesses regarding the DNA evidence.

In addition I have been informed by Assistant District Attorney Wren that subsequent to the conviction in the present case the defendant was convicted of similar crimes in Manhattan and these convictions were also based on DNA evidence.

*Id.*

By Order dated December 12, 2007, the court held:

A review of the record and applicable law shows that petitioner's instant motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure only presents issues of law. Accordingly, the hearing scheduled for January 9, 2008 is not an evidentiary hearing. *See* 28 U.S.C. § 2243 ("Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.").

The participation of petitioner's former state trial counsel is not necessary. The warden is to have petitioner available via telephone so that he can have an opportunity to argue his motion.

*See* Order dated Dec. 12, 2007, Docket Entry No. 49.

## G. January 9, 2008 Non–Evidentiary Hearing

The hearing on January 9, 2008 was not an evidentiary hearing. Harrison participated via a telephone, was not sworn, and no new evidence was considered by the court.

The January 9 hearing had been previously adjourned on three different occasions due to Harrison's alleged mental health problems. *See supra* part II.F. It appears from Harrison's practice in this court and state court that as the time of a court ordered hearing approaches, Harrison seems to have psychological difficulties requiring adjournments. Prior to the January 9, 2008 hearing, Harrison was again transferred to a mental health unit inside the prison due to "an acute mental crises." *See* Transcript of January 9, 2008 Hearing ("Jan. 9 Hr.") at 3, Docket Entry No. 50. Since his attorney had filed what would be an equivalent of an *Anders* brief in a habeas proceeding, Harrison's participation at the hearing via telephone was desirable to ensure that his interests were not adversely affected. *See Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *supra* part II.F.

Harrison was brought to a telephone to participate at the hearing. *See* Jan. 9 Hr. at 7–8. After hearing from Harrison's attorney and Harrison about his innocence claim, *id.* at 8–11, the court informed the parties of its intent to sever Harrison's Rule 60(b) motion into two part:

The Court: Do you see any objection to this court splitting ... [the Rule 60(b)] ... so that ... the question of whether a [Rule 60(b)] ... lies to challenge my prior dismissal of his habeas petition and then setting up the new claim of actual innocence as a second petition [and] instead of dismissing it, transferring it to the Second Circuit.

Goldberg [attorney for Harrison]: No objection, Judge.

. . . .

The Court: That's what we are going to do, Mr. Harrison, okay?

Harrison: Yes, your Honor.

The Court: I hope you feel better, okay?

Harrison: Thank you.

The Court: Have a good day.

Harrison: I'll try.

*Id.* at 12–13; *see also infra,* part IV.C.

The court found that Harrison was coherent throughout the hearing. *See* Jan. 9 Hr. at 14. His attempt to delay the hearing were based on malingering, consistent with his prior actions in state and federal courts.

### H. Similar and Unrelated Crimes in Other Jurisdictions

While Harrison was collaterally challenging his convictions for crimes on Victims 1, 2, and 3 in this court, police investigators matched his DNA to that found on another rape victim ("Victim 4") in New York County (Manhattan). For crimes committed against Victim 4 in 1995, Harrison was convicted in state court in New York County of two counts of first degree rape, three counts of first degree sodomy, one count of first degree robbery, and one count of first degree burglary, and sentenced to seven consecutive terms of 25 years imprisonment. *See Harrison v. Walsh,* No. 06–CV–13328, 2007 WL 1576265 (S.D.N.Y. June 1, 2007) (report and recommendation by magistrate judge); *Harrison v. Walsh,* No. 06–CV–13328, 2007 WL 2844867 (S.D.N.Y. Sept.27, 2007) (adopting the magistrate judge's report and recommendation). Although the nature of those crimes and proceedings have been thoroughly addressed by the Magistrate Judge in federal habeas proceedings involving those crimes in the Southern District of New York, it is significant that Harrison's centerpiece argument in those proceedings was: "it was reversible error for the jury to convicted [him] solely on the basis of testimony of a DNA expert...." *Harrison,* 2007 WL 1576265, at *1 (quotation marks omitted).

### III. Harrison's Rule 60(b) Motion Challenging the Denial of the Original Habeas Petition in This Court

### A. Rule 60(b) of the Federal Rules of Civil Procedure

Rule 60(b) of the Federal Rules of Civil Procedure provides that a district court, "[o]n motion and upon such terms as are just ... may relieve a party or a party's legal representative from a final judgment, order, or proceeding" for one of several enumerated grounds, including fraud, mistake, and newly discovered evidence. Fed.R.Civ.P. 60(b). Subsections one through five delineate specific grounds for relief. Subsection six is a catch-all provision, stating that relief may be granted "for any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(6).

The Supreme Court has interpreted subsection six as requiring a showing of "extraordinary circumstances" to "justify[ ] the reopening of a final judgment." *Gonzalez v. Crosby,* 545 U.S. 524, 535, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005) (internal quotation marks omitted). *See also Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 864, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) ("[Rule 60(b)(6)] should only be applied in extraordinary circumstances"); *Ackermann v. United States,* 340 U.S. 193, 199, 71 S.Ct. 209, 95 L.Ed. 207 (1950) (same). "Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)." *Agostini v. Felton,* 521 U.S. 203, 239, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). The Court defined extraordinary circumstances that justified relief under Rule 60(b)(6) motions as errors which rose above "excusable neglect." *Klapprott v. U.S.* 335 U.S. 601, 613, 69 S.Ct. 384, 93 L.Ed. 266 (1949).

■ Any motion under Rule 60(b)(6) "shall be made within a reasonable time." Fed. R.Civ.P. 60(b)(6). To determine whether a 60(b)(6) motion is timely, a court must "look at the particular circumstances of each case and 'balance the interest in finality with the reasons for delay.' " *Grace v. Bank Leumi Trust Co. of N.Y.,* 443 F.3d 180, 190 n. 8 (2d Cir.2006) (quoting *Kotlicky v. U.S. Fid. & Guar. Co.,* 817 F.2d 6, 9 (2d Cir.1987)).

■ With respect to a habeas proceeding pursuant to 28 U.S.C. § 2254, when a Rule 60(b) motion asserts a federal basis for relief from a state court's conviction, it is "in substance a successive habeas petition and should be treated accordingly." *Gonzalez v. Crosby,* 545 U.S. 524, 531, 125 S.Ct. 2641, 162

L.Ed.2d 480 (2005). A Rule 60(b)(6) motion should not be "treated as a successive habeas petition if it does not assert, or reassert, claims of error in the movant's state conviction." *Id.* at 538, 125 S.Ct. 2641.

■ In the instant Rule 60(b) motion, Harrison argues that this court erroneously denied his original habeas petition because he did not have counsel for the April 27, 2001 hearing. This claim does not attack the state court conviction. Instead, it challenges the May 8, 2001 Order denying the original habeas petition and a certificate of appealability. For this claim, Harrison relies on Rule 8 of the Section 2254 Habeas Rules. *See* Harrison's Rule 60(b) Mot. at 4; *see also* 28 U.S.C. § 2254 (Rule 1) (providing that the Rules Governing Section 2254 Cases in the United States District Courts "govern a petition for a writ of habeas corpus filed in a United States district court under 28 U.S.C. § 2254"). Such a motion is of a type appropriate under Rule 60(b).

Harrison also attacks the integrity of his state court conviction by raising a claim of factual innocence. This claim is in effect a successive petition, not the basis for a Rule 60(b) motion. It is discussed in section VI, *infra.*

## B. Evidentiary Hearings and Appointment of Counsel in Section 2254 Cases

Rule 8 of the Section 2254 Habeas Rules was amended in 2004; the hearing in Harrison's case took place in 2001. Rule 8 regulates evidentiary hearings and appointment of counsel. The Advisory Committee noted that the 2004 amendments were part of a "general restyling of the rules" and that "[t]hese changes are intended to be stylistic and no substantive change is intended." 28 U.S.C. § 2254 (Rule 8 advisory committee notes). Because the pre-amendment Rule 8 is substantively similar to the current Rule 8, the post-amendment language of the rule is used in this Memorandum and Order. *See Graham v. Portuondo*, 506 F.3d 105, 107 n. 1 (2d Cir.2007) (per curiam) ("Because [petitioner's] evidentiary hearing took place in 2003, we apply the pre-amendment language of Rule 8 in this case. We see no reason at this juncture, however, why we would not take a similar approach under the new language in a properly presented case.").

Subsection (a) of Rule 8 provides: "[i]f the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." 28 U.S.C. § 2254 (Rule 8(a)). Although unclear as to when a hearing constitutes an evidentiary hearing for habeas purposes, the Court of Appeals for the Second Circuit has found an evidentiary hearing to take place in the following circumstances:

> The District Court referred to the hearing as an evidentiary hearing twice in its decision denying the § 2254 petition, relied heavily on trial counsel's testimony in its determination that counsel was effective, and specified in its October 2003 order that the purpose of the hearing was to offer trial counsel the opportunity to present evidence on his behalf. There is no question that the hearing was evidentiary.

*Graham*, 506 F.3d at 108 (citing *United States v. Vasquez*, 7 F.3d 81, 84 (5th Cir. 1993); *Rauter v. United States*, 871 F.2d 693, 696 (7th Cir.1989); *Shepherd v. United States*, 253 F.3d 585, 587 (11th Cir.2001)).

In *Vasquez*, the court held that an evidentiary hearing took place when the magistrate judge labeled the hearing as an evidentiary hearing in his order setting the hearing; in the opening comments the Magistrate Judge indicated that the petitioner's claims "required some evidentiary development;" petitioner "was placed on the stand and interrogated at length by both the Magistrate Judge and the prosecution;" and at the end of the hearing petitioner was asked "if he had any witnesses he wished to call." *Vasquez*, 7 F.3d at 84.

The court's finding that an evidentiary hearing took place in *Rauter* was based on the following facts:

> Both the government and [petitioner] examined and cross-examined witnesses. [Petitioner] himself took the stand to present his case, and the government cross-examined him. Additionally, during the hearing and in its order denying [petitioner's] ... motion, the district court indicated that it was conducting an evidentiary hearing. *See* [Hearing Transcript] at 26

(asking [petitioner], "Do you have any other evidence?"); District Court's Order, Rec. 32, at 1 (noting that the court heard "evidence put on by both parties"). Based on the record, it is clear that the April 29, 1988, proceeding was an evidentiary hearing.

*Rauter*, 871 F.2d at 696.

According to the *Shepherd* court: "[w]e observe that the proceedings clearly resembled an evidentiary hearing, despite the district court's unwillingness to categorize it as such, because the court placed [petitioner] under oath and questioned him extensively concerning the basis of his claims." *Shepherd*, 253 F.3d at 587.

Subsection (c) of Section 2254 Habeas Rule 8 provides that "[i]f an evidentiary hearing is warranted, the judge *must* appoint an attorney to represent a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A" 28 U.S.C. § 2254 (Rule 8(c)) (emphasis added). The Advisory Committee's Notes explain, "the furnishing of counsel is made mandatory" at such evidentiary hearings because "[c]ounsel can perform a valuable function benefitting both the court and the petitioner.... At a hearing, the petitioner's claims are more likely to be effectively and properly presented by counsel." *Id.* (Rule 8 advisory committee notes). Section 3006A(a)(2) of Title 18 of the United States Code provides as follows: "Whenever the ... court determines that the interests of justice so require, representation *may* be provided for any financially eligible person who ... (B) is seeking relief under section ... 2254 ... of title 28." 18 U.S.C. § 3006A(a)(2).

Although Rule 8(a)'s use of the word "must" makes appointment of counsel mandatory in those habeas cases where an evidentiary hearing is held, it seems to refer the standard for appointment to 18 U.S.C. § 3006A without making a reference to a particular subsection of that statute. Section 3006A, which was enacted as the Criminal Justice Act of 1964 after the Supreme Court's decision in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), contains a congressional plan for furnishing legal representation at federal expense for certain indigent defendants. Over the years, section 3006A has been supplemented with guidelines promulgated by the Judicial Conference of the United States. *See* 28 U.S.C. § 331 (establishing a judicial conference). The guidelines for the appointment of counsel pursuant to section 3006A are found in volume 7 of the *Guide to Judiciary Policies and Procedures.* With respect to appointment of counsel in habeas cases, the language of the statute is clear—it requires appointment of counsel for those petitioners who are financially eligible only when the court determines that appointment is in "the interests of justice." 18 U.S.C. § 3006A(a)(2), (a)(2)(B).

One reading of Section 2254 Habeas Rule 8(c) in conjunction with its reference to section 3006A would make appointment of counsel mandatory only in those cases when an evidentiary hearing is held *and* when appointment in those circumstances would be in the interests of justice. *See* 28 U.S.C. § 2254 (Rule 8(c)); 18 U.S.C. § 3006A(a)(2), (a)(2)(B). As the advisory committee notes, however, when an evidentiary hearing is held, Rule 8(c) makes appointment of counsel mandatory—regardless of whether appointment would be in the interests of justice under 18 U.S.C. § 3006A(a)(2). In this respect, Rule 8(c) seems to supersede the statute.

■ In some circumstances a rule may supersede a prior statutory provision; Congress has a part in rule-making. *See* 28 U.S.C. § 2071, 2072, 2073, 2074, 2077; 18 U.S.C. § 3771, 3772 (Repealed 1988). *See also* MONOGRAPH, REFORM OF COURT RULE-MAKING PROCEDURES (1977); *but see* Geoffrey C. Hazard, Jr., Book Review, *Undemocratic Legislation*, 87 Yale L.J. 1284 (1987) (reviewing REFORM OF COURT RULE-MAKING); James L. Oakes, Book Review, *Reform of Court Rule–Making Procedures*, 78 COLUM. L.REV. 205 (1978) (reviewing REFORM OF COURT RULE-MAKING PROCEDURES).

■ The Court of Appeals for the Second Circuit appears to have decided that Section 2254 Habeas Rule 8(c) supersedes the statute: "Although we have previously noted in dicta the mandatory nature of Rule 8(c), ... we ... now hold that a district court's failure to follow [Habeas] Rule 8(c) ... is clear error." *Graham*, 506 F.3d at 108 (citations omitted). In effect it holds that appointment

of counsel in those habeas cases in which an evidentiary hearing is held is, as a matter of law, always in the interests of justice:

> The respondent cautions us against adopting a bright-line rule with respect to the Rule 8(c) appointment of counsel requirement, asserting that it could lead to a waste of public funds or the curtailment of evidentiary hearings in the district courts. We reject this argument. The appointment of counsel in these cases is meant to benefit "both the court and the petitioner," and to make the hearings more effective. As Rule 8 makes clear, the representation of indigent petitioners by counsel when district courts determine that their cases require evidentiary development is an important goal, irrespective of the cost. Indeed, the voluminous, relevant evidence ... underscores the need for the assignment of counsel to petitioners who lack the skills or resources to present their cases properly at such hearings.

*Id.* at 108 (citations omitted).

Nearly all non-capital habeas cases filed by prisoners in state custody are commenced *pro se* or with the aid of a seasoned fellow inmate commonly known as a "jailhouse lawyer." *See* 1 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 12.2d (5th ed.2005): *see also Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) ("Since inmates had no alternative form of legal assistance available to them, we reasoned [in *Johnson v. Avery,* 393 U.S. 483, 489, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)] that [a] ban on jailhouse lawyers effectively prevented prisoners who were 'unable themselves, with reasonable adequacy, to prepare their petitions,' from challenging the legality of their confinements.").

Notwithstanding Section 2254 Habeas Rule 8(c) applicable in federal court, the Supreme Court has rejected the proposition that the federal Constitution requires a right to counsel in post conviction collateral attacks in state courts. *See Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987) (noting that it had "never held that prisoners have a constitutional right to counsel when mounting collateral attacks to their convictions" in state courts); *Murray v. Giarratano,* 492 U.S. 1, 7–8, 109 S.Ct. 2765,

106 L.Ed.2d 1 (1989) (plurality opinion) ("We held in *Finley* that ... there was no federal constitutional right to counsel for indigent prisoners seeking state post-conviction relief"); *Coleman v. Thompson,* 501 U.S. 722, 755, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (holding that except in limited circumstances, "*Finley* and *Giarratano* established that there is no right to counsel in state collateral proceedings."). The Court has, however, noted that "quality legal representation is necessary in capital habeas corpus proceedings in light of the seriousness of the possible penalty and the unique and complex nature of the litigation. An attorney's assistance prior to the filing of a capital defendant's habeas corpus petition is crucial ..." *McFarland v. Scott* 512 U.S. 849, 855, 114 S.Ct. 2568, 2572, 129 L.Ed.2d 666 (1994) (internal quotation marks, ellipses and citations omitted).

The conclusion of the Court of Appeals for the Second Circuit in *Graham* that a federal habeas court considering a 28 U.S.C. § 2254 petition commits reversible error when it fails to appoint counsel for an evidentiary hearing is based on a sound understanding of habeas practice at the district court level. *See Graham,* 506 F.3d at 108. The voluminous state court records, complexity of federal habeas law and lack of adequate counsel at state court proceedings necessary to ensure the protection of federal constitutional rights underscores *the need for the appointment of counsel in all habeas cases*—not only when the district court decides to hold an evidentiary hearing. *See* James S. Liebman, *An "Effective Death Penalty"? AEDPA and Error Detection in Capital Cases,* 67 BROOK. L.REV. 411, 426 (2001) ("AEDPA complicates review ... because of its poor drafting .... [and][b]y adding litigation steps, rather than cutting them. Because of AEDPA, virtually every step of a habeas case now proceeds in three steps, instead of the previous one or two."); COMM'N ON THE FUTURE OF INDIGENT DEFENSE SVCS., FINAL REPORT TO THE CHIEF JUDGE OF THE STATE OF NEW YORK 15 (2006) (noting that "New York's current fragmented system of ... indigent defense services fails to satisfy the state's constitutional and statutory obligations to protect the rights of the indigent accused."); William Glaberson, *In*

*Tiny Courts of N.Y., Abuses of Law and Power,* N.Y. TIMES, Sept. 25, 2006.

Appointment of counsel is necessary for the habeas petitioner—whether in a section 2254 or 2255 case—who almost invariably lacks the skills or resources to present claims of a constitutional violation effectively. The federal habeas judge must also have the advice of counsel for petitioner and respondent in order to work through the complex pitfalls of the Antiterrorism and Effective Death Penalty Act and state practice. The judge must see that a person is not held by the state "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

There are, however, cases where the state court record is complete and clear, the contention of petitioner is one based on the law, and it is frivolous. This is such a case in which burdening the court's limited habeas counsel panel would have been unjustified.

### C. Lack of Merit to Rule 60(b) Motion

█ In the instant case the record supports the finding that the April 27, 2001 hearing was not an evidentiary hearing on Harrison's § 2254 petition and that appointment of counsel was not required. The Order dated March 26, 2001 which scheduled the hearing provides: "A hearing will be held in the captioned case on April 27, 2001, at 9:00 a.m. If possible, the Warden is to have the petitioner available via telephone to participate at the hearing." *See* Order dated March 26, 2001. Harrison provided his position on the law via telephone. *See* Transcript of April 27, 2001 hearing at 2 (noting that Harrison will be participating via telephone).

Based on the fact that Harrison was not placed under oath and the court's denial of his petition was not based on new facts or evidence not already in the state court record, no evidentiary hearing was conducted on April 27, 2001. Harrison was not entitled to the appointment of counsel for the April 27 hearing under Section 2254 Habeas Rule 8(c). Because his claims raised issues of law only and were frivolous his requests for counsel were properly denied. *See* Order dated April 16, 2001 (denying Harrison's request for appointment of counsel "absent a showing of possible merit, with leave to renew.").

The Court of Appeals for the Second Circuit affirmed the denial of Harrisons' original habeas petition after the federal district court disposition without counsel for petitioner. *See* Mandate of the Court of Appeals for the Second Circuit dated January 28, 2003, No. 01–2304, Docket Entry No. 27 (*quoting* 28 U.S.C. § 2253(c)).

Insofar as it attacks disposition of the federal habeas petition, there is no basis for the current motion pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure. Harrison has not shown any extraordinary circumstances warranting relief—his Rule 60(b) motion is denied on the merits to the extent that it seeks to challenge the denial of his original petition for the writ of habeas corpus.

### IV. Harrison's Rule 60(b) Motion Alleging Factual Innocence

### A. Successive Habeas Petition

As noted *supra* part III. A., when a Rule 60(b) motion asserts a federal bases for relief from a state court's conviction, it is "in substance a successive habeas petition and should be treated accordingly." *Gonzalez,* 545 U.S. at 531, 125 S.Ct. 2641. *See also Brooks v. United States,* No. 99–CV–2855, 2005 WL 2076565, *5 (E.D.N.Y. Aug. 26, 2005) (characterizing a Rule 60(b) motion as a successive petition). Under AEDPA, successive federal habeas petitions requesting relief from a conviction in state court must satisfy strict requirements before a district court can adjudicate the merits of a petitioner's claim. Section 2244(b) of Title 28, as amended by AEDPA, provides:

(1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

(2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b).

Rule 9 of the Rules Governing Section 2254 Cases in United States District Courts was amended in 2004 to reflect this change: "Before presenting a second or successive petition, the petitioner must obtain an order from the appropriate court of appeals authorizing the district court to consider the petition as required by 28 U.S.C. § 2244(b)(3) and (4)." 28 U.S.C. § 2254 (Rule 9). Without an authorization from the appropriate court of appeal, a federal district court does not have subject matter jurisdiction over a successive habeas petition. *See United States v. Gallegos,* 142 F.3d 1211 (10th Cir. 1998) (holding that a "district court lack[s] subject matter jurisdiction to decide" a successive petition).

**B. Lack of Merit**

■ Harrison's second claim cannot be considered by the court because it is a successive habeas petition couched in the language of a Rule 60(b) motion. In this claim, Harrison attacks the integrity of the state court criminal proceeding by raising a claim of factual innocence. *See* Harrison's Rule 60(b) Mot. at 23–26. He cites a document which he alleges demonstrates that the prosecution's expert witness perjured herself as to the identity of the individual who conducted the forensic testing of physical evidence which the prosecution submitted at trial. *Id.* He claims that this information requires reconsideration of Mary Quigg's testimony, the prosecution's forensic witness. *See* Harrison's Rule 60(b) Mot. at 23.

This claim must be denied because Harrison has not obtained an authorization from the Court of Appeals to file a successive petition in the district court. *See* 28 U.S.C. § 2244(b)(3)(A). Although this court does not have subject matter jurisdiction over this claim, Harrison is referred to the letter filed by his counsel, *supra* part II.F., which would explain why his claim is meritless even if the court was to consider his second claim on the merit.

**C. Transfer to Court of Appeals Rather than Dismissal**

■ The Court of Appeals for the Second Circuit has held that "when a second or successive petition for habeas corpus relief ... is filed in a district court without the authorization by this Court that is mandated by § 2244(b)(3), the district court should transfer the petition or motion to this Court in the interest of justice pursuant to § 1631...." *Liriano v. United States,* 95 F.3d 119, 123 (2d Cir.1996) (per curiam). *See also Corrao v. United States,* 152 F.3d 188, 190–91 (2d Cir.1998) (holding that a district court must transfer uncertified second or successive habeas petitions to the appropriate court of appeals). In general, it is more conducive to efficiency to transfer a successive petition filed in the district court to the Court of Appeals. This practice avoids the burden of requiring a prisoner with limited legal resources to draft a new set of papers in order to apply to the Court of Appeals after dismissal by the district court.

The Court of Appeals for the Second Circuit has cautioned district courts "not [to] recharacterize a portion of the 60(b) motion as a second or successive collateral attack and transfer it ... until the prisoner has been informed of the district court's intent to transfer and afforded a sufficient opportunity to avoid the transfer." *Gitten v. United States,* 311 F.3d 529, 534 (2d Cir.2002). The district court "always has the alternative of simply denying, as beyond the scope of Rule 60(b) ... the portion believed to present new attacks on the conviction." *Id.*

As noted *supra* part II.G., Harrison was informed by the court of its intent to treat his claim of factual innocence as a successive petition and to transfer it to the Court of Appeals for the Second Circuit. Harrison had already presented this claim to the Court of Appeals for the Second Circuit when he sought leave to file a successive habeas peti-

tion in the district court. *See* Mandate of the Court of Appeals for the Second Circuit dated January 19, 2007, No. 06–4775-op. The Court of Appeals denied the motion because Harrison had "failed to satisfy the criteria set forth in 28 U.S.C. § 2244(b)(1) and (2)." *Id.* It seems unlikely that the Court of Appeals will now permit a successive petition in these circumstances. Nevertheless, in view of this court's lack of jurisdiction transfer is appropriate.

## V. Certificate of Appealability as to the Rule 60(b) Motion Challenging the Denial of the Original Habeas Petition

Section 2253(c)(1) of Title 28 of the United State Code provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding. . . ." 28 U.S.C. § 2253(c)(1). A post–2254 judgment ruling on a Rule 60(b) motion probably should not, in circumstances such as those in the present case, be deemed a "final order" requiring consideration of a certificate of appealability by the district court. Nevertheless, the Court of Appeals for the Second Circuit has held that "the [certificate of appealability] requirement provided in 28 U.S.C. § 2253(c) applies to an order denying a Rule 60(b) motion for relief from a judgment denying a § 2254 petition." *Kellogg v. Strack,* 269 F.3d 100, 103 (2d Cir.2001) (per curiam).

In the context of a denial of a Rule 60(b) motion, the petitioner must make "a substantial showing that the district court abused its discretion." *Kellogg,* 269 F.3d at 104. The Court of Appeals for the Second Circuit has specified its Rule 60(b) practice: in the circumstances of a Rule 60(b) motion, a certificate of appealability "should issue only if petitioner shows that (1) jurists of reason would find it debatable whether the district court abused its discretion in denying the Rule 60(b) motion, and (2) jurists of reason would find it debatable whether the underlying habeas petition, in light of the grounds alleged to support the 60(b) motion, states a valid claim of the denial of a constitutional right." *Id.*

▮ As to the denial of a Harrison's Rule 60(b) motion on the merits, a certificate of appealability is denied. Harrison has not shown that "(1) jurists of reason would find it debatable whether the district court abused its discretion in denying the Rule 60(b) motion, and (2) jurists of reason would find it debatable whether the underlying habeas petition, in light of the grounds alleged to support the 60(b) motion, states a valid claim of the denial of a constitutional right." *See id.*

Since the court does not have subject matter jurisdiction over Harrison's claim of factual innocence—as discussed *supra* III.A. and IV.A., that claim is deemed a successive habeas petition filed in the district court without an authorization from the Court of Appeals—there appears to be no reason to discuss the certificate of appealability issue for that claim. *See Rogers v. Artuz,* 524 F.Supp.2d 193, 200–01 (E.D.N.Y.2007) (noting that there is no need for the district court to issue or deny a certificate of appealability for a Rule 60(b) motion under *Kellogg* when that motion has been characterized as a successive habeas petition). In any event, a certificate of appealability as to that claim is also denied, should one be required by the Court of Appeals. *Id.*

## VI. Conclusion

The April 27, 2001 hearing was not an evidentiary hearing. Since Harrison's claims were frivolous he was not entitled to an appointment of counsel; his requests for appointment of counsel were properly denied. Harrison's instant motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure is denied on the merits to the extent that it pertains to the claim challenging the denial of the original habeas petition.

The portion of Harrison's Rule 60(b) motion alleging a claim of factual innocence is in effect a successive habeas petition which this court does not have subject matter jurisdiction to consider. A transfer of that claim to the Court of Appeals of the Second Circuit is granted. The clerk of the court shall transfer the Rule 60(b) motion in part, as a successive habeas petition in accordance with this Memorandum, Order and Judgment.

A certificate of appealability is denied on all aspects of the Rule 60(b) motion.

SO ORDERED.